**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

**EDDIE LAREECE PITTMAN** **PLAINTIFF**

**v.** **Case No. 3:19-cv-00239-LPR**

**NICE-PAK PRODUCTS, INC.** **DEFENDANT**

# ORDER

For a short time in 2018, Plaintiff Eddie Pittman did temporary work (through a temp agency) at Nice-Pak Products, Inc. During this time, he unsuccessfully applied for a different, permanent position with Nice-Pak. In addition to not getting the new job, he was removed from his temporary assignment at Nice-Pak. Mr. Pittman sued Nice-Pak, believing these actions were the result of illegal discrimination under Title VII of the Civil Rights Act of 1964.[1]

In May of 2020, the Court granted Defendant's Partial Motion to Dismiss.[2] The Order left only one pending claim: a Title VII race-based disparate-treatment claim arising from the termination of his temporary assignment at Nice-Pak. Defendant now moves for summary judgment on this last claim.[3] For the reasons discussed below, the Motion is GRANTED.

## Facts

Many facts in this case are undisputed. Where a fact is disputed, the Court assumes the veracity of the Plaintiff's version of the fact unless no rational juror could do so based on the

[1] 42 U.S.C. § 2000e *et seq*. Mr. Pittman is African-American. His live claim alleges racial discrimination.

[2] Order granting Defendant's Partial Motion to Dismiss, Doc. 47.

[3] Defendant's Motion for Summary Judgment, Doc. 56. Summary judgment occurs when the court rules in favor of a party without the need for a trial. A party is entitled to summary judgment if the evidence, viewed in the light most favorable to the party on the other side of the lawsuit, shows that there is no genuine dispute as to any fact that is important to the outcome of the case. FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

record. Additionally, the background facts outlined in the Court's previous Order remain relevant and therefore are (in substantial part) repeated here for clarity and context.[4]

A. Mr. Pittman's Work at Nice-Pak

In February of 2018, Mr. Pittman began doing work at Nice-Pak through a temporary employee agency, Express Personnel.[5] He worked on the production assembly line.[6] Because it is relevant to the legal analysis *infra*, the Court takes a moment to lay out the specifics of Mr. Pittman's employment.

Express Personnel interviews and hires its own employees, who then are assigned on an as-needed basis to companies such as Nice-Pak.[7] Of the several job opportunities presented to Mr. Pittman by Express, Mr. Pittman opted for the shift work at Nice-Pak because of the flexibility with his schedule.[8] Mr. Pittman explained that Express would call him at the beginning of each week with shift work availability from which Mr. Pittman could pick.[9] When Mr. Pittman first arrived at Nice-Pak for his shift work, he was not given any orientation. Rather, he was simply taken to the line and shown what to do.[10] Mr. Pittman acknowledged that temporary employees like himself had no authority to enter Nice-Pak unsupervised.[11]

---

[4] Order, Doc. 47.

[5] Amended Complaint, Doc. 21 at 1 & 3.

[6] *Id*. at 3.

[7] Declaration of Stanley Lichucki, Doc. 56-1 at 2, ¶ 4; Deposition of Mr. Pittman, Doc. 56-2 at 6, p. 17.

[8] Deposition of Mr. Pittman, Doc. 56-2 at 8, p. 23.

[9] *Id*. at 8, p. 25.

[10] *Id*. at 14, p. 49.

[11] Declaration of Stanley Lichucki, Doc. 56-1 at 3, ¶ 10; Deposition of Mr. Pittman, Doc. 56-2 at 16-17, pp. 56–58.

Nice-Park uses the temporary workers from Express for non-technical production-line work.[12] Nice-Pak does not interview the Express employees. Each week Nice-Pak informs Express of its staffing needs for temporary-shift workers.[13] Nice-Pak has no control over which employee Express sends to a specific shift.[14] Nice-Pak considers the shift-employees sent by Express to be Express's employees as Express handles their pay, withholds taxes, and provides them W-2s.[15] Express shift workers record their time on a separate system than Nice-Pak employees do, and Express shift workers are supervised by on-site Express personnel.[16] Nice-Pak does not retain personnel files for Express shift workers.[17]

In deposition testimony, Mr. Pittman confirmed that he worked for Express; he explained that Express was the employer who sent its workers out to clients.[18] Mr. Pittman recounted that any problems he had at Nice-Pak were to be reported to Express, not to Nice-Pak.[19] And, after he was removed from Nice-Pak and told not to return, Mr. Pittman immediately notified Express; he explained to Express his belief that the discovery of his criminal background was what prompted

---

[12] Declaration of Stanley Lichucki, Doc. 56-1 at 2, ¶ 4.

[13] *Id*. at 3, ¶ 5.

[14] *Id*.

[15] *Id*. at 3, ¶¶ 6–7; Deposition of Mr. Pittman, Doc. 56-2 at 14, p. 47; Doc. 56-2 at 66.

[16] Declaration of Stanley Lichucki, Doc. 56-1 at 3, ¶ 8; Deposition of Mr. Pittman, Doc 56-2 at 13, p. 44.

[17] Declaration of Stanley Lichucki, Doc. 56-1 at 3, ¶ 9.

[18] Deposition of Mr. Pittman, Doc. 56-2 at 6, p.17.

[19] *Id*. at 13, p. 43.

the decision.[20] Mr. Pittman stated, "technically, regardless of what took place at Nice-Pak, Express personnel was my employer."[21]

B. Mr. Pittman's Application for a Permanent Job And Its Aftermath

In his deposition, Mr. Pittman explained that opportunities for permanent employment with a particular Express client, such as with Nice-Pak, would sometimes arise.[22] During his work at the Nice-Pak facility, Mr. Pittman learned of and pursued a position as an Analytical Lab Technician at Nice-Pak's on-site laboratory.[23] This would have been a permanent Nice-Pak position, as opposed to a temporary Express position.

On March 29, 2018, a Nice-Pak Human Resources (HR) representative conducted a telephone screening interview with Mr. Pittman.[24] From Mr. Pittman's perspective, the screening "went very well."[25] Then, on April 2, 2018, Nice-Pak Quality Control Manager Brandy Mullins and Nice-Pak Raw Material Coordinator Dustin Armstrong interviewed Mr. Pittman.[26] During the interview, Mr. Pittman "was informed about more specifics in relation to" the position, including salary, job responsibilities, and shift schedules.[27] Mr. Pittman discussed his relevant work

---

[20] *Id.* at 99–100 ("I was scheduled to see HR manager Alissa Reynolds who obviously got info related to [my] criminal background . . . . I am pursuing [a] complaint against Nice Pak for using my BG info without telling me. . . . it was my background which Ms. Reynolds obtained without informing me or my permission to use to preclude me from securing the Lab Technician job.").

[21] *Id.* at 12, p. 39.

[22] *Id*. at 6, p. 17.

[23] Amended Complaint, Doc. 21 at 4.

[24] *Id*.; Answer to Amended Complaint, Doc. 26 at 5.

[25] Amended Complaint, Doc. 21 at 4.

[26] *Id*.; Answer to Amended Complaint, Doc. 26 at 5; Declaration of Brandy Mullins, Doc. 56-3 at 3, ¶ 7.

[27] Amended Complaint, Doc. 21 at 4–5; Deposition of Mr. Pittman, Doc. 56-2 at 25, p. 93.

experience and scholastic training.[28] He "made [an] effort to show strong interest in becoming part of the Nice Pak family."[29] He told the interviewers that "he would adjust his current routines . . . to satisfy" the shift schedule.[30]

Mr. Pittman acknowledges one potentially out-of-the-ordinary interaction during his interview. At some point, Mr. Pittman noted that he would see Nice-Pak "as part of his career even with his intent to start a family related lab on the side."[31] Subsequently, Mr. Pittman "inquired about the transition process where specific training may be involved with respect to . . . getting him adequately prepared to do [the] job as a lab tech" and whether "he could take the [standard operating procedures]/method related materials home for the sake of study and helping him quickly and efficiently get through that transition phase."[32] He was told "such materials were not allowed off site."[33] He then asked "if he could at least take notes while being orientated to this new lab setting . . . ."[34] Mr. Pittman does not recall the answer.[35] Mr. Pittman says in his Amended Complaint:

> That is all the Plaintiff remembers regarding that inquiry while the dialogue remained positive and constructive enough that it appeared on both ends that this would be a perfect fit. The Plaintiff does not remember anything being said regarding signing of a form that would ensure practices and lab details would

---

[28] Amended Complaint, Doc. 21 at 4; Deposition of Mr. Pittman, Doc. 56-2 at 22, pp. 78–80.

[29] Amended Complaint, Doc. 21 at 4.

[30] *Id*. at 5.

[31] *Id*. at 4; *see also* Deposition of Mr. Pittman, Doc. 56-2 at 22–23, pp. 81–85; Declaration of Brandy Mullins, Doc. 56-3 at 3, ¶ 7.

[32] Amended Complaint, Doc, 21 at 4; *see also* Answer to Amended Complaint, Doc. 26 at 5; Deposition of Mr. Pittman, Doc. 56-2 at 24, p. 86; Declaration of Brandy Mullins, Doc. 56-3 at 3, ¶ 8.

[33] Amended Complaint, Doc. 21 at 4; Answer to Amended Complaint, Doc. 26 at 5; Deposition of Mr. Pittman, Doc. 56-2 at 24, p. 87; Declaration of Brandy Mullins, Doc. 56-3 at 3, ¶ 8.

[34] Amended Complaint, Doc. 21 at 4; *see also* Deposition of Mr. Pittman, Doc. 56-2 at 25, pp. 91–93.

[35] Amended Complaint, Doc. 21 at 4; Deposition of Mr. Pittman, Doc. 56-2 at 25, pp. 91–92.

> remain confidential and not used for other activities and if it was, the Plaintiff obviously had or would have no issue with that.[36]

Overall, Mr. Pittman remembers the interview as "constructive" and recalls "no friction whatsoever."[37] "Towards the end of the talk, it appeared to the Plaintiff that [the interviewers] liked what they saw in the Plaintiff . . . ."[38] Ms. Mullins told Mr. Pittman there were other candidates, but also intimated that he "was looking strong."[39] Mr. Pittman was ready to complete the interview process that day by attending a pre-scheduled meeting with HR; however, he was told HR was unavailable because of "meetings that ran over" and would contact him to re-schedule.[40] Mr. Pittman recounts that "the thought did cross his mind that they [HR] did an informal background search on [him] then decided not to further pursue his candidacy."[41]

Three days later, on April 5, 2018, Nice-Pak instructed Express to end Mr. Pittman's assignment.[42] Mr. Pittman tells the story of that day as follows. He was working on the assembly line.[43] "[H]e had lost his safety glasses, etc. and was told to go to [the] front desk and get [a] new set."[44] He did so and then returned to the line.[45] The person at the front desk, who gave him a new safety-glasses pack, was a Nice-Pak employee that "he saw days earlier in route to the interview

---

[36] Amended Complaint, Doc. 21 at 5.

[37] *Id*.; Deposition of Mr. Pittman, Doc. 56-2 at 25, p. 93 & at 27, p. 98.

[38] Amended Complaint, Doc. 21 at 5.

[39] *Id*.

[40] *Id*.; Deposition of Mr. Pittman, Doc. 56-2, at 26, pp. 95–97; Declaration of Brandy Mullins, Doc. 56-3 at 3, ¶ 10.

[41] Amended Complaint, Doc. 21 at 5; Deposition of Mr. Pittman, Doc. 56-2 at 31, pp. 115–16.

[42] Answer to Amended Complaint, Doc. 26 at 5; Declaration of Brandy Mullins, Doc. 56-3 at 4, ¶ 14.

[43] Amended Complaint, Doc. 21 at 5; Deposition of Mr. Pittman, Doc. 56-2 at 28, pp. 104–05.

[44] Amended Complaint, Doc. 21 at 5; Deposition of Mr. Pittman, Doc. 56-2 at 28–29, pp. 105–09.

[45] *Id*.

for the lab position."[46] "[S]hortly thereafter, the Plaintiff was escorted off the premises and asked not to return."[47] "Just before being escorted off [the premises], a worker with supervisional [sic] authority asked the Plaintiff if in fact, he was there earlier in the week on Monday for [the] lab interview . . . ."[48] "While being escorted off," this unidentified individual told Mr. Pittman that what was happening was "relate[d] to something involved with your application process on Monday."[49] Aside from this, Nice-Pak provided no explanation to Mr. Pittman for its decisions not to hire him and to fire him.

Nice-Pak has provided evidence on why it escorted Mr. Pittman from the facility, told him not to come back, and instructed Express to end Mr. Pittman's assignment to Nice-Pak. The reasons given by Nice-Pak for its actions do relate back to the interview for the open Nice-Pak Analytical Lab Technician job. Ms. Mullins, one of the interviewers for the open spot, testified by declaration as follows:

- "Mr. Pittman's applications and resume did not indicate that he was then working at Nice-Pak on a temporary assignment . . . ."[50]

- During the interview, Mr. Pittman "spoke about owning or starting a 'family business' which had or would have a laboratory component."[51]

- "During the interview, Mr. Pittman requested to take home Nice-Pak's Standard Operating Procedures ("SOP") and Work Instructions ("WI"). This request concerned me because these materials contained confidential and proprietary business information. I told him these materials were not allowed off-site. Mr. Pittman expressed disappointment with my

---

[46] Amended Complaint, Doc. 21 at 5; Deposition of Mr. Pittman, Doc. 56-2 at 29, pp. 106–08.

[47] Amended Complaint, Doc. 21 at 5.; Deposition of Mr. Pittman, Doc. 56-2 at 30, pp. 110–112; Declaration of Brad Dye, Doc. 56-4 at 2, ¶ 2.

[48] Amended Complaint, Doc. 21 at 5; Declaration of Brad Dye, Doc. 56-4 at 3, ¶ 4.

[49] Amended Complaint, Doc. 21 at 5.

[50] Declaration of Brandy Mullins, Doc. 56-3 at 3, ¶ 6.

[51] *Id*. at 3, ¶ 7.

response, and I thought his tone was becoming confrontational."[52]

- "I left the room briefly to speak with Alissa Reynolds, a former Human Resources representative, and told her that Mr. Pittman was not a good candidate."[53]
- "After speaking with Ms. Reynolds, I returned to the conference room and informed Mr. Pittman that Human Resources would not be able to meet with him that day. Mr. Pittman appeared to be unhappy with not having the opportunity to tour the lab."[54]

After Mr. Pittman's interview, Ms. Mullins shared her perceptions of the interview with Stanley Lichucki, the Nice-Pak Site Director.[55] Specifically, she told Mr. Lichucki that she "was concerned by Mr. Pittman's statements about his family business, his request to take home Nice-Pak's SOPs and WIs, and his request to tour the laboratory."[56] She added that she "was concerned that Mr. Pittman might improperly use Nice-Pak's confidential business information for his business if Nice-Pak hired him."[57]

At the time of this conversation, neither Ms. Mullins nor Mr. Lichucki knew Mr. Pittman was a temporary shift worker at Nice-Pak, as Mr. Pittman had not disclosed that information in the interview nor in his application.[58] Mullins and Lichucki did not learn of Mr. Pittman's work at the Nice-Pak facility until April 5, 2018.[59] When they did learn of it, a decisive and immediate decision

---

[52] *Id*. at 3, ¶ 8.

[53] *Id*. at 3, ¶ 9.

[54] *Id*. at 3, ¶ 10.

[55] *Id*. at 4, ¶ 11; Declaration of Stanley Lichucki, Doc. 56-1 at 3, ¶ 12.

[56] Declaration of Brandy Mullins, Doc. 56-3 at 4, ¶ 11.

[57] *Id*.

[58] Declaration of Stanley Lichucki, Doc. 56-1 at 4, ¶ 13; Declaration of Brandy Mullins, Doc. 56-3 at 3, ¶¶ 6, 12; Deposition of Mr. Pittman, Doc. 56-2 at 22, p. 81; Mr. Pittman's application, Doc. 56-2 at 68 & 70; Mr. Pittman's resume, Doc. 56-2 at 86 (Taking the question literally, Mr. Pittman denied having ever been an employee of Nice-Pak in his application. Furthermore, Mr. Pittman failed to reference his employment with Express in the Employment section of the application.).

[59] *Id*. Mr. Pittman does not dispute this fact. While Ms. Mullins does not explain how she and Lichucki ultimately learned about Mr. Pittman's work, recall that Mr. Pittman explains that, on April 5, 2018, he asked for new glasses

was made. Mr. Lichucki explained that, given Ms. Mullins's concerns as well as Mr. Pittman's failure to disclose he was already working in a temporary position at the Nice-Pak facility, he decided to have Mr. Pittman removed from the premises.[60] The same day, a group of Nice-Pak managers, including Mr. Lichucki, met to review what they perceived as a security risk.[61] The group directed Mr. Lichucki to inform Express that Nice-Pak no longer wanted Mr. Pittman assigned to its shift work.[62]

## **Analysis**

Nice-Pak argues that Mr. Pittman's remaining disparate-treatment claim should be dismissed for two reasons. Nice-Pak first contends that Mr. Pittman was an employee of Express rather than Nice-Pak. As a result, Nice-Pak argues that Title VII protections that govern employees do not cover a temporary-shift worker assigned through an employment agency like Mr. Pittman. Alternatively, Nice-Pak argues that Mr. Pittman has not established a *prima facie* case of discrimination. The Court agrees with both points.

Employees, not independent contractors, are protected by Title VII.[63] Whether Mr. Pittman is an employee is question of law.[64] The Eight Circuit has taken great care to enumerate applicable factors and the weight these factors should be given in determining who is considered an employee

---

from a front desk employee that "he saw days earlier in route to the interview for the lab position." Amended Complaint, Doc. 21 at 5. Mr. Pittman noted that this employee "looked suspiciously at him," and Mr. Pittman even suggested that the suspicion was related to his application for the open position. Deposition of Mr. Pittman, Doc. 56-2 at 29, p. 107–08.

[60] Declaration of Stanley Lichucki, Doc. 56-1 at 4, ¶ 13; Declaration of Brandy Mullins, Doc. 56-3 at 4 ¶ 13.

[61] Declaration of Stanley Lichucki, Doc. 56-1 at 4, ¶ 14; Declaration of Brandy Mullins, Doc. 56-3 at 4, ¶ 14.

[62] Declaration of Stanley Lichucki. at 4, ¶¶ 14–15; Declaration of Brandy Mullins, Doc. 56-3 at 4, ¶14.

[63] *Hunt v. State of Mo., Dept. of Corrections*, 297 F.3d 735, 741 (8th Cir. 2002) (citing *Schwieger v. Farm Bureau Ins. Co. of Neb.*, 207 F.3d 480, 484 (8th Cir. 2000)).

[64] *See Lerohl v. Friends of Minn. Sinfonia*, 322 F.3d 486, 488 (8th Cir. 2003).

for Title VII purposes.[65] In this case, there's no serious dispute about Mr. Pittman's employee status. He is an employee of Express, not Nice-Pak. True, the Eighth Circuit has recognized that a person can be an employee of more than one business.[66] But, considering the parameters of Mr. Pittman's work, Nice-Pak was not a second employer. All Nice-Pak really controlled was the manner in which Mr. Pittman's production-line work was accomplished. Mr. Pittman readily admits that he was hired by, worked for, was given weekly assignments by, and was paid by Express—not Nice-Pak. It's thus no surprise that, in his Response to Summary Judgment, Mr. Pittman does not respond to Nice-Pak's argument that he was an independent contractor. That silence speaks volumes.

Even if Mr. Pittman were an employee of Nice-Pak, Mr. Pittman has not established a *prima facie* race discrimination claim with respect to the termination of his temporary assignment.[67] There is nothing in Mr. Pittman's papers that support a claim that he was terminated because of his race. He has not pointed to any similarly situated individual who was treated more favorably. Indeed, not even Mr. Pittman argues that the termination of his temporary assignment was based on race. Rather, Mr. Pittman's speculation—unsupported by a scintilla of evidence—is that Nice-Pak's actions resulted from Nice-Pak's discovery of Mr. Pittman's undisclosed criminal history. [68]

Mr. Pittman's entire Response to Summary Judgment is focused solely on challenging the credibility of Ms. Mullin's claims regarding her perceptions of the interview for the open position.

---

[65] *Id.* at 489 (considering the factors enumerated in the Restatement (Second) of Agency to determine the nature of a work relationship); *see also Schwieger*, 207 F.3d at 484 (quoting *Nationwide Mut. Ins.Co. v. Darden*, 503 U.S. 318, 323–24 (1992) (highlighting non-exhaustive list of factors for Courts to consider).

[66] *Hunt*, 297 F.3d at 742.

[67] *See Putman v. Unity Health Sys.*, 348 F.3d 732, 734–37 (8th Cir. 2003).

[68] *See supra* note 20.

In short, Mr. Pittman argues that his perception of the interview—that it was constructive and went well—at least raises a disputed question of fact for a jury to decide. But none of that matters. It is undisputed that, during the interview, (1) Mr. Pittman said that he wanted to start a family lab business, and (2) he asked to take home confidential Nice-Pak materials. It is also undisputed that he didn't disclose his temporary work at Nice-Pak in the application process for the open position.

Nice-Pak had a legitimate reason for escorting Mr. Pittman off the premises and instructing Express to stop sending him to work at Nice-Pak. Evidence-based concerns about truthfulness and potential improper personal or competitive use of confidential company information certainly qualify as legitimate race-neutral reasons for Nice-Pak's conduct. The Court does not sit as a super-HR board. Whether the Court would have taken the same actions that Nice-Pak took based on the interview is irrelevant. There's no shred of evidence to suggest pretext, let alone pretext for racial discrimination.

**Conclusion**

Defendant's Motion for Summary Judgment (Doc. 56) is granted. Judgment shall be entered in favor of the Defendant.

IT IS SO ORDERED this 3rd day of September 2021.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE